| 39 | 493 |
| 46 | 328 |

WALTON E. BURLINGIM, APPELLANT, v. CHARLES E.
    WARNER ET AL., IMPLEADED WITH NORMAN A.
    KUHN ET AL., APPELLEES, AND BRENNAN & BAG-
    LEY ET AL., APPELLANTS.

FILED FEBRUARY 20, 1894.   No. 5245.

1. **Review**: FINDINGS OF TRIAL COURT.   In cases tried to the
court without a jury the finding on questions of fact is entitled
to the same weight and the same presumption of correctness as
a verdict of a jury.   The rule is the same whether the case is
brought to this court on error or appeal, and applies to all classes
of actions.

2. **Mechanics' Liens**: VENDOR AND VENDEE.   Where the owner
of land completes negotiations for the sale thereof and the
vendee takes possession without the consent of the owner and
commences the erection of a building, but fails to make the pay-
ment of the purchase money, which by the terms of the sale was
to be made upon the delivery of the conveyance, and the vendor
refuses to make a conveyance or complete the contract without
such payment, no agreement in writing having been executed,
the vendor is not charged with liens for labor and material used
in constructing the building.

3. ——: ——: ESTOPPEL.   The vendor, in such a case, when he
learned that the building was in progress, warned those en-
gaged in its erection that they were trespassers and that the
person with whom they had contracted had no rights in the
property, but subsequently visited the premises and complained
of the manner in which some of the work was being performed.
The circumstances did not justify an inference that the mechan-
ics had relied upon his later acts or undertaken or continued
their work on the faith thereof.   *Held*, That he was not thereby
estopped from asserting his title as against the mechanics' liens.

4. **Mortgages**: CANCELLATION OF RELEASE: MECHANICS' LIENS.
A loan and trust company had contracted to lend the vendee
money secured by mortgage upon the premises.   The mortgage
had been delivered and by the trust company recorded, but no
money advanced.   The agreement was that the money should
not be advanced until the vendee procured title and had ex-
pended a certain sum in constructing the buildings, and that the
vendee should furnish the trust company a bond conditioned

that the buildings should cost a stipulated sum. The vendor refused to convey because of the vendee's failure to pay the purchase money, and the vendee did not furnish to the trust company such a bond as its agreement required. The trust company then executed releases of its mortgage. *Held*, That persons claiming liens growing out of the construction of the buildings had no equity by which they could require a conveyance to be made, the releases of the mortgage canceled and the money advanced thereon and applied to the payment of their claims.

APPEAL from the district court of Douglas county. Heard below before WAKELEY, J.

*Winfield S. Strawn* and *Charles H. Breck*, for appellants.

*Isaac E. Congdon* and *George F. Gilmore*, contra.

IRVINE, C.

Walter E. Burlingim began this suit to foreclose a mechanic's lien upon certain lots in the city of Omaha. Charles E. Warner, Egbert E. French, Norman A. Kuhn, the Central Loan & Trust Company, and a number of other parties were made defendants. The defendants not named claim mechanics' liens upon the property.

The plaintiff in his petition alleged a contract between the defendants Goddard and Seivert and the defendant Warner to erect for Warner two brick dwellings upon the lots in controversy, and the purchase by Goddard and Seivert from the plaintiff of materials which were delivered and used for the purpose of erecting such buildings; that Warner was then the owner of the property "by some contract of purchase from Norman A. Kuhn, in whom was the fee title," and that under said contract Warner had entered into possession of the premises; that under the contract Warner was required to erect the buildings upon the lots; that plaintiff furnished the material and filed a claim of lien as required by law; that while the contract for the erection of the buildings and purchase

of the lots was made with Warner, yet Warner was insolvent and was acting in the whole matter for the defendant French ; that Kuhn took from French and Warner a bond conditioned to relieve such realty from mechanics' liens, and to secure the erection of such buildings clear and free of such liens. The petition further avers that the defendant. the Central Loan & Trust Company had two certain mortgages from Warner and wife upon said lots in the sum of $7,500, duly recorded, but that no part of the sum secured by said mortgages had ever been paid, but the whole was yet in the hands of the trust company, which company the plaintiff avers has always been ready to pay over the same upon the execution and delivery by Kuhn of a deed to Warner, but that Kuhn refuses unlawfully to deliver such deed. The prayer is for the establishment of the mechanic's lien prior to any claims of Kuhn, Warner, and French ; that Kuhn be decreed to deliver a deed to the property, and that the trust company be required to bring the proceeds of the loan into court, and out of that the plaintiff's lien paid, and in any event the property be sold to satisfy the same. There were other prayers incident to the above which need not be specifically stated.

Some of the defendants claiming liens filed cross-petitions in substance similar to the original petition. Other defendants filed cross-petitions alleging, in terms, that Warner acted in the premises as agent for Kuhn. Still others averred ownership generally in Warner without averring any facts which could possibly charge any interest which Kuhn might have with their liens. These differences in the pleadings become unimportant in the view we take of the case.

Warner, by his answer, denied everything except his contract with Goddard and Seivert, and that he was in possession of the property under a contract of purchase from Kuhn.

Kuhn, by answer, averred that he agreed with Warner

upon the terms of a sale, and that the proposed contract
was put in writing; that the purchase price of the prop-
erty was to be $5,000, $1,200 of which was to be paid in
cash, but that the contract was never executed; that
Warner never paid any of the purchase price; that Kuhn
never gave Warner the right to enter into possession, never
authorized the construction of improvements upon the
property, and expressly told plaintiff while he was deliver-
ing material that Warner had no right or interest in the
premises.

To this answer the plaintiff replied, denying each mate-
rial affirmative allegation, and averring that when plaintiff
found the title to be in Kuhn he applied to Kuhn and was
by Kuhn informed that the premises had been sold to War-
ner and that French was taken as surety on the contract for
the sale of the land and building of the houses, and that
Kuhn would consider the sale by Burlingim a good sale,
and that thereupon the plaintiff delivered the material;
that Kuhn was present at the buildings, gave instructions
in regard to the contract, and assumed a superintendency
thereof.

The Central Loan & Trust Company answered that it
had two mortgages "on file" upon the property and that
no part of the sum described by said mortgages had been
paid, but denied that it had ever been ready to pay over
the same, and averred that it was one of the express con-
ditions of the contract of loan that no money was to be
paid until Warner had acquired title in fee-simple to the
premises, and had fully constructed the buildings; that
Warner had not finished the buildings and had not ac-
quired title to the premises, and that the trust company
had declared its agreement at an end and entered of record
releases of the mortgages.

The different pleadings, based upon the original petition
and the cross-petitions, are numerous and voluminous, but
their nature is fairly summarized by saying that they re-

sulted in forming issues upon all the claims substantially similar to those above stated.

A trial was had and a decree rendered finding that neither the plaintiff nor any defendant had any claim or lien upon the interest of Kuhn; that the different mechanic's lien claimants had liens in amounts specified upon such interest as Warner might have in the premises; that Kuhn did not enter into any contract by virtue of which Warner was under obligation to or had a right to erect any building upon the premises, but that the verbal negotiations for such contract were never completed by the performance of the conditions precedent upon which Kuhn was to enter into such contract, and that no written contract had ever been executed. The court declined to adjudicate the question of Warner's equitable rights.

The plaintiff and the defendants claiming mechanics' liens appeal from the decree, claiming that the evidence brings the case within the rule stated in *Bohn Mfg. Co. v. Kountze*, 30 Neb., 719.

On behalf of the appellants the argument is based chiefly upon the state of affairs which the testimony on their behalf tended to establish, and it is urged that the testimony on behalf of Kuhn should not prevail against the contradicting evidence. It is said that upon appeal the case should be tried *de novo*, and that the findings of the trial court are a nullity in an equity case brought here upon appeal. It would seem that this question is so well settled that it should not be again raised. In cases tried to the court without a jury the finding on questions of fact is entitled to the same weight and the same presumptions of correctness as would be accredited to the verdict of a jury. (*Cheney v. Eberhardt*, 8 Neb., 423; *Hartley v. Dorr*, 15 Neb., 451; *McLaughlin v. Sandusky*, 17 Neb., 110; *Roggencamp v. Seeley*, 19 Neb., 170; *Cass County Bank v. Morrison*, 17 Neb., 341; *Bond v. Dolby*, 17 Neb., 491.) A large number of cases might be cited. In this respect the rule is the same

36

upon appeal as in proceedings in error. (*Newman v. Mueller*, 16 Neb., 523; *Armstrong v. Freeman*, 9 Neb., 11.) Indeed, many of the cases cited were appeals.

The appellants urge a reason, which is at least unique, for departing from the established rule in this case. It is as follows: "If it is urged that any presumptions of correctness attach to the decision of the court below, we cannot only urge that the trial here is *de novo*, but remind this court—and do it in the utmost courtesy to the lower court—that upon the most important principles in mechanic's lien cases, and in almost everything that goes to sustain the law, or to make it what it was intended to be, *remedial*, in short, to give it any efficacy whatever, this court has had to reverse the district court, and do it in no uncertain terms, nor to any limited extent. In justice to these mechanics who earn their living in this way, and to whom, therefore, the legislative power has given this additional remedy for the enforcement of their claims for payment of their labor and material," etc. We should think mechanics and material-men should be satisfied with the privileges granted them by the terms of the mechanics' lien law and the liberal construction this court has always placed upon it, and not seek to arrogate to themselves, because the legislature has granted them so many favors, the benefits of a course of procedure not granted to any other class of litigants, and contrary to principles firmly established in the jurisprudence of the state. The findings of the trial court must, therefore, prevail as to questions of fact, if they have for their support such evidence as would sustain the verdict of a jury, or the findings of a court in a case not relating to mechanics' liens. The search, therefore, must be for evidence which will sustain the findings of the trial court, and not for evidence which might have sustained contrary findings. When so examined, the testimony of Kuhn tends to show that in the winter of 1889 and 1890 he and Warner had

negotiations looking towards the sale of the lots to Warner. Kuhn proposed to sell for $5,000, $1,500 to be paid in cash and the deferred payments to be secured by mortgage. Later, Kuhn agreed to accept $1,200 in cash, and finally agreed that if Warner would build two houses upon the lots of a character agreed upon, Kuhn would accept as security for the deferred payment a mortgage which would be subject to two mortgages, each for $3,500, which would be made for the purpose of procuring money for building. In addition to this a satisfactory bond was to be furnished and given to Kuhn. Contracts embodying the agreement were drawn up but never signed by either party. Warner never paid the $1,200, or any part thereof; on the contrary, he sought, at a later period, to induce Kuhn to accept notes secured by second mortgage on other property in lieu of cash, and that failing, he endeavored to have Kuhn accept the $1,200 out of the loan which was to have been made by the Central Loan & Trust Company, and which the contracts contemplated should be used in constructing the buildings. The latter course Kuhn finally agreed to, but when they went to the agent of the trust company they were met with a refusal to complete the loan because Warner did not tender to the trust company a satisfactory bond. Other reasons were assigned by the trust company; but upon this branch of the case the only important fact is that the trust company did refuse to complete the loan; Kuhn did not receive the $1,200, or any part thereof, and neither contract nor deed was ever delivered. In the meantime, the evidence tends to show Warner had taken possession of the property and begun the construction of the houses. When Kuhn ascertained this, he notified the people at work thereon that they were trespassers, and that Warner had acquired no rights. Kuhn is corroborated in very many particulars, and the trial court was justified in believing him. There is nothing showing any such part performance as would take the case out of the statute of

frauds. According to the testimony on behalf of appellees, Kuhn did not put Warner in possession. Warner simply took possession, and Kuhn persistently denied and controverted his rights, insisting at all times that the payment of $1,200 should be made before any conveyances should be delivered.

There is evidence tending to show that when Kuhn informed the mechanics that they were trespassers, work was stopped, and the following morning Goddard and Seivert came to Kuhn's place of business inquiring if Warner had been there. Before they left, Warner entered. Warner and Kuhn had a conversation which it seems neither Goddard nor Seivert heard. In this conversation Kuhn swears that he told Warner that he would not permit the men to go to work until Warner paid the money, signed the contract, and "got the whole thing in shape." After this it appears that Warner told Goddard and Seivert it was "all right" and directed them to proceed, but there is evidence that Kuhn did not hear that statement. Accepting this evidence as establishing the facts, it is clear that not only was there no privity between Kuhn and the contractors, but there was none between Kuhn and Warner, and that Kuhn was no more responsible than 'he would be for the acts of a total stranger trespassing upon his property. Goddard and Seivert proceeded with the work, and it is undisputed that Kuhn several times thereafter visited the premises and was aware the work was in progress. The number of times he was present and his acts while at the premises are matters upon which the evidence is conflicting. It is certain, however, that he, on two occasions at least, after the work had progressed to a very considerable extent, made complaint as to the manner in which some of the work had been done and asked that the defects be remedied, explaining that he expected to have a second mortgage on the property and was therefore interested in having the building properly constructed. Kuhn says this state-

ment was made because he was still being led to believe that Warner would eventually perform his bargain. All this, it must be remembered, was after Kuhn had informed the contractors that they were trespassers and that Warner had no rights in the premises. It was after they had undertaken the work and after they had expended a great deal of labor thereon. It is plain that they could not have entered into their contracts with Warner relying upon Kuhn's acts; that they did not begin the work or begin to furnish material in reliance thereon; and there is nothing whatever to show that they continued the work after Kuhn's visits, relying upon his conduct. On the contrary, the inference rather is that they resented his conduct as an officious interference on his part. Were it shown that he by his language or conduct had led them to make the contract, to begin the work, or even to continue beyond a point where they would otherwise have ceased, an entirely different question would be presented. But under the facts as they appear, it cannot be claimed that Kuhn was estopped from setting up his title as against the mechanics' lienors.

So far we have discussed the case solely with reference to the relations between Kuhn and the mechanics' lienors. As against the Central Loan & Trust Company, the lienors claim that the contract for a loan was completed; that the trust company accepted the mortgages and placed them upon record, and is bound, irrespective of other facts, to furnish the money thereon, which should equitably be applied to the discharge of the liens. The applications for the loans are dated the "——— day of April, 1890." They said, among other things: "Title is in the name of Charles E. Warner." "Describe the buildings fully. Nine rooms, two-story and basement brick residences, size 25 by 40 feet, have slate roof, gas, city water, bath, furnace, mantel. Frame barn, size 14 by 16 feet, 12-foot posts." "When were they built? April, 1890." "In what repair at present? Good repair." The title was not in Warner, the

buildings were not then completed, nor had they approached completion.    If we are confined to the written contract, these were material misrepresentations which would relieve the trust company from the obligation of advancing the money and entitled it to cancel the contracts.    If we can go outside of the writing, there is evidence that there was a verbal agreement that the money should not be advanced until Warner had title, and not then until a certain amount had been expended upon the buildings, and that Warner agreed to furnish a bond conditioned, among other things, that the houses should cost not less than $4,500.    As already seen, Warner did not procure title, and there is evidence tending to show that while he tendered a bond it was not one in conformity to the agreement.    The loan company was under no obligations then to advance the money and was justified in executing releases of the mortgages and annulling its contract.    We have discussed the question solely in view of the evidence tending to sustain the findings of the trial court.    There was a great deal of testimony of a different nature.    Whether if such other testimony had been believed by the trial court, and whether if the negotiations between Kuhn and Warner had been perfected and reached the status of an enforceable contract a different decree would have been required, are questions not before us for determination.

There was ample evidence to sustain the findings of the trial court.    Upon a consideration of that evidence it requires no argument to show that the lienors have no equity either as against Kuhn or the trust company.

JUDGMENT AFFIRMED.